**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 17-cv-01514-CMA-KMT

ERIN PETERSON,

      Plaintiff,

v.

USAA LIFE INSURANCE COMPANY,

      Defendant.

_____

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

This matter is before the Court on Defendant USAA Life Insurance Company's Motion for Summary Judgment. (Doc. # 74.) Plaintiff filed a response (Doc. # 82) on June 6, 2018 and Defendant filed a reply (Doc. # 86) on June 20, 2018. Having thoroughly reviewed the underlying briefing, pertinent record, and applicable law, the Court grants Defendant's Motion for the following reasons.

## I.    <u>BACKGROUND</u>

In 2015, Theodore Bobkowski ("Decedent") applied for a life insurance policy with Defendant USAA Life Insurance Company. (Doc. # 74 at 9.) Based on Decedent's answers in Defendant's application, Defendant agreed to issue him a $1 million, 20-year term life insurance policy under Defendant's "Preferred Ultra" risk class, which is the

least expensive risk class that Defendant offers. (*Id*.) The policy became effective on September 21, 2015. (*Id*.) Decedent unexpectedly died on October 22, 2016, a little over a year after obtaining the policy. (*Id*. at 10.)

Subsequently, Plaintiff, as the named beneficiary, submitted a claim to Defendant on the policy. (Doc. # 21 at 2.) However, because Decedent died within the policy's two-year contestability period, Defendant requested and obtained from Plaintiff a HIPAA release in order to review Decedent's medical records. (Doc. # 74 at 10.) Defendant then analyzed the records to determine whether Decedent's medical history was consistent with his responses in Defendant's application. (*Id*.)

Defendant discovered that Decedent's application omitted numerous details of Decedent's medical history. (*Id*.) In particular, Defendant learned for the first time that Decedent had been diagnosed with Obstructive Sleep Apnea (OSA) in November 2012 during the first of two sleep study diagnostics which Decedent had not disclosed in his application. (*Id*. at 3, 10.) Under Defendant's underwriting guidelines, however, an applicant is not eligible for the Preferred Ultra risk class if the applicant has been diagnosed with OSA that has not been surgically resolved. (*Id*. at 10.)

On January 10, 2017, Defendant denied Plaintiff's claim and refused to pay benefits on the grounds that Decedent materially misrepresented his medical history by failing to disclose his OSA diagnosis. (*Id*. at 11.) Thereafter, Plaintiff brought this suit in state court asserting claims against Defendant for breach of contract, bad faith breach of contract, and violation of the Colorado Consumer Protection Act ("CCPA"). (Doc. # 21 at 2.) Defendant removed the suit to federal court. (Doc. # 1.) In the instant motion,

Defendant argues that it is entitled to summary judgment because it was justified in denying Plaintiff's claim on Decedent's life insurance policy and because there is a lack of evidence to substantiate Plaintiff's CCPA claim.

## II. ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbot Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 118 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, a court may not resolve issues of credibility, and must view the evidence in the light most favorable to the nonmoving party—including all reasonable inferences from that evidence. *Id*. However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id*. In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claims; rather, the movant need simply point the court to a lack of evidence for the other party on an essential

element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant meets its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy this burden. *Id*. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmoving party." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**B.     APPLICATION**

Plaintiff asserts three claims for relief against Defendant. Specifically, Plaintiff alleges: Defendant breached the life insurance contract into which Defendant entered with Decedent; Defendant's alleged breach of contract was in bad faith; and Defendant violated the Colorado Consumer Protection Act ("CCPA") by engaging in deceptive trade practices. (Doc. # 12 at 3-5.) Defendant, by contrast, argues: Defendant's denial of Plaintiff's claim was proper because Decedent knowingly made material misrepresentations regarding his health; Defendant's denial of Plaintiff's claim was justified and thus not in bad faith; and Plaintiff's CCPA claim fails because Plaintiff has

not met its burden of producing evidence to substantiate Plaintiff's allegations. (Doc. # 74 at 3.) The Court will address each of Defendant's arguments in turn.

      1.    <u>Defendant's Denial of Plaintiff's Life Insurance Claim</u>

Defendant's denial of Plaintiff's life insurance claim was justified because the Decedent made material misrepresentations about his health in his insurance application. Although an insurer may not cancel a policy to avoid a pre-cancelation loss, there are circumstances that allow insurers to "avoid" coverage after-the-fact. *See Hollinger v. Mut. Benefit Life Ins. Co.*, 560 P.2d 824, 827 (Colo. 1977). In particular, an insurer's liability may be avoided when the insured concealed a material fact while completing an insurance application. *Id.*; *Silver v. Colorado Cas. Ins. Co.*, 219 P.3d 324, 328 (Colo. App. 2009) *cert. denied*, No. 09SC309, 2009 WL 3534579 (Colo. Nov. 2, 2009). Specifically, the insurer must prove:

> (1) the applicant made a false statement of fact or concealed a fact in his application for insurance; (2) the applicant *knowingly* made the false statement or knowingly concealed the fact; (3) the false statement of fact or the concealed fact *materially affected* either the acceptance of the risk or the hazard assumed by the insurer; (4) the insurer was ignorant of the false statement of fact or concealment of fact and is not chargeable with knowledge of the fact; (5) the insurer relied, to its detriment, on the false statement of fact or concealment of fact in issuing the policy.

*Hollinger*, 560 P.2d at 827 (emphasis added) (footnote omitted).[1] However, an insurer's contractual obligations cannot be avoided if the insured's misrepresentation resulted from an ambiguous question on an insurance application. *Id.* at 824.

---

[1] The Court notes that Plaintiff argues that "Plaintiff need not discuss the materiality of the answer to issue to policy [sic] or [Defendant's] knowledge." (Doc. # 82 at 13.) Plaintiff also contends that "the question of whether [Defendant] actually knew or had reason to know about Decedent's sleep apnea, is immaterial." (*Id.*) However, Plaintiff's arguments are clearly

Here, Defendant establishes that it detrimentally relied on material misrepresentations Decedent knowingly made on his insurance application. However, Plaintiff fails to establish that Decedent's misrepresentations were due to an ambiguous question on Defendant's insurance application. Therefore, there is no genuine dispute of fact and Defendant is entitled to summary judgment.

    *a.    Decedent concealed facts in his insurance application*

It is undisputed that Decedent was diagnosed with a medical condition known as Obstructive Sleep Apnea ("OSA") in 2012. (Doc. # 74 at 3.) OSA is "a condition whereby people typically snore, [and] have some pausing or cessation of their breathing at night." (Doc. # 74-14 at 25.) It is also undisputed that Decedent sought medical care for his OSA on multiple occasions. Specifically:

- Decedent underwent a sleep study in November 2012 which is a diagnostic test designed to detect disorders such as OSA (Doc. # 74 at 3) (the results of the study indicated that Decedent had moderate OSA);

- Decedent treated his OSA with a Continuous Positive Airway Pressure ("CPAP") machine, which is a mask placed over the nose and mouth that forces air into the lungs (*id*. at 2);

- Decedent underwent a second sleep study in January 2013 to determine the amount of pressure from the CPAP machine that was necessary to prevent his airways from becoming obstructed during sleep (*id*. at 4);

---

inapposite with the applicable standard set forth in *Hollinger* and are, therefore, erroneous. *Hollinger*, 560 P.2d at 827.

- Decedent consulted a doctor regarding his sleep studies in February 2013 (*id*); and

- Decedent consulted a second doctor regarding his OSA in October 2013 (*id*.).

Additionally, it is undisputed that Decedent did not disclose his OSA diagnosis on his life insurance application. (*Id*. at 7-8.)

Decedent omitted his OSA diagnosis notwithstanding several relevant sections of Defendant's life insurance application. Specifically:

- The application indicated that completion required "[c]ontact information for all doctors and facilities" as well as "[m]edical history, including dates of diagnosis, tests and treatments" (Doc. # 74-3 at 5);

- The application inquired whether the insured:

  o "[had] ever consulted with a health care provider for: asthma, emphysema, pneumonia or other respiratory system disorder?" (Doc. # 74-13 at 35);

  o "within the past five years: had an electrocardiogram, X-ray *or any other diagnostic test or procedure* that was not previously disclosed?" (*Id*.) (emphasis added); or

  o "consulted a health care provider for any reason not previously disclosed?" (*Id*.)

Decedent answered the foregoing questions in the negative. (*Id*.)

Decedent completed the life insurance policy application in 2015. (Doc. # 12 at 2.) Therefore, Decedent was required to disclose his sleep diagnostics because those tests were conducted within the applicable five-year period. Additionally, Decedent was

required to disclose his OSA diagnosis because the application explained that sleep apnea was considered a "respiratory system disorder." (Doc. # 74-5 at 1.) Finally, Decedent was required to disclose his OSA related consultations with health care providers—if for no other reason—because he had not previously disclosed those consultations in the application. Despite the fact that the terms of the application required Decedent to disclose his OSA diagnosis and related consultations and diagnostics, Decedent omitted the necessary information. Thus, by answering the relevant application questions in the negative, Decedent made false statements of fact regarding pertinent medical history.

### b. Decedent concealed facts knowingly

In order for an insurer to avoid coverage of a claim, the insured must have knowingly made a false statement—or knowingly concealed—a material fact in the insured's application. *Hollinger*, 560 P.2 at 827; *Silver*, 219 P.3d at 328. Importantly, an insured does not need to intend to deceive the insurer. *Hollinger*, 560 P.2d at 827 ("where the evidence shows that the applicant has knowingly made false statements material to the risk undertaken by the insurer, the insurance policy can be avoided without establishing a separate element of an 'intent to deceive.'"). However, an insurer's contractual obligations cannot be avoided if the insured's misrepresentation resulted from "an answer to an insurer's question that is ambiguous or too general to evoke a material response." *Id*. at 824.

For instance, "a question that calls for the applicant to state whether he has suffered from a number of enumerated maladies, followed by the general catch-all

phrase, 'or other disease or ailment or surgical operation,' is overly broad" because it denies "an applicant the opportunity, as a reasonable person, to determine the scope of the question." *Id*. Questions that may be ambiguous are measured by an objective standard. *Id*. Thus, in order to determine whether an applicant made a misrepresentation knowingly—as opposed to the misrepresentation being the product of an ambiguous question—courts consider "whether a reasonable person, with the applicant's physical or mental characteristics, under all the circumstances, would understand that the question calls for disclosure of specific information." *West Coast Life Ins. Co. v. Hoar*, 558 F.3d 1151, 1157 (10th Cir. 2009) (quoting *Hollinger*, 560 P.2d at 827).

Therefore, the actual or subjective knowledge of the applicant is irrelevant.[2] *Hollinger*, 560 P.2d at 826. Where an insurance applicant has consulted medical professionals regarding a particular condition but denies the same on an application, it is appropriate for courts to find that the misrepresentation was "knowing" as a matter of law. *See id*. at 825-26. In *Hollinger*, for example, the Supreme Court of Colorado found that a life insurance applicant made a knowing misrepresentation, as a matter of law, when the applicant responded in the negative to a question asking if he had seen a

---

[2] The Court notes that Plaintiff's response to the instant motion argues that it "is a disputed issue whether and to what extent [Decedent] understood the nature of his condition and whether he considered it to be a 'respiratory condition' within the meaning of the [application] question." (Doc. # 82 at 15.) However, Decedent's subjective interpretation of his condition is irrelevant in light of the objective standard set forth in *Hollinger*. Therefore, Plaintiff's argument that Decedent's subjective knowledge creates a genuine dispute of material fact is erroneous.

psychiatrist in the past seven years when the applicant had actually consulted a psychiatrist on eleven occasions in the year before he purchased the policy. *Id*.

Here, Decedent knowingly concealed facts about his OSA diagnosis in his life insurance application. Defendant's application asked whether applicants "[had] ever consulted with a health care provider for: asthma, emphysema, pneumonia or other respiratory system disorder?" (Doc. # 74-13 at 35.) The foregoing question is not, as Plaintiff asserts, vague, ambiguous, or misleading. (Doc. # 82 at 6.)

The word "respiratory" is defined as "[d]esignating, relating to, or affecting the organs involved in respiration; of or relating . . . to the process of oxygen transport and respiration." *Respiratory, adj.*, OXFORD ENGLISH DICTIONARY, http://www.oed.com/view/-Entry/163819?redirectedFrom=respiratory& (last visited Oct. 10, 2018). One of the primary features of Defendant's OSA diagnosis was "pausing or cessation of [his] breathing at night." (Doc. # 74-14 at 25.) Moreover, OSA is treated with a device that forces air into the lungs. (Doc. # 74 at 2.) Therefore, it is clear that OSA involves the process of oxygen transport and respiration. As such, OSA is fairly characterized as a respiratory disorder because it pertains to a defect in the process of respiration.

Accordingly, a reasonable person in Decedent's circumstances—a person who had undergone multiple sleep diagnostics that analyzed their rate of oxygen intake, consulted with multiple health care professionals about the nature of OSA, and treated the condition with a machine that facilitated breathing—would understand that a question inquiring about respiratory disorders calls for disclosure of specific information related to an OSA diagnosis. (Doc. # 74-14 at 2) (listing oxygen intake levels and

apnea-hypopnea index under the heading "RESPIRATORY MEASURES" in Decedent's 2012 sleep diagnostic). Assuming, *arguendo*, that a reasonable person could find a question about "respiratory disorders" to be unclear in its scope, Defendant's application cures any possible doubt.

The application question regarding respiratory disorders features a hyperlinked definition of the term "other respiratory system disorder." (Doc. # 74-5 at 1.) If selected by an applicant, the definition explicitly characterizes "sleep apnea" as a respiratory disorder. (*Id.*) The explanatory link is conspicuously located immediately below the "other respiratory system disorder" question and it is highlighted with a dotted blue line for emphasis. (*Id.*) Moreover, "[t]he law charges a party to a contract . . . with knowledge of its contents." *West Coast Life Ins. Co. v. Hoar*, 505 F. Supp. 2d 734, n.3 (D. Colo. 2007) (citing *Barciak v. United of Omaha Life Ins. Co.*, 777 F. Supp. 839, 843 (D. Colo. 1991) ("[O]ne who signs a contract is presumed to have read and understood each of its terms."); *O'Brien v. Houston*, 262 P. 1020, 1021 (1927) ("[O]ne cannot say he did not know the contents of a contract he has executed.")), *aff'd*, 558 F.3d 1151 (10th Cir. 2009). Therefore, a reasonable person familiar, as Decedent was (Doc. # 74-14 at 205), with computers would easily resolve any perceived ambiguity in the relevant application question by simply reading the corresponding explanation.

Thus, as in *Hollinger*, Decedent consulted with health care providers multiple times regarding a particular condition but denied the same on his application. *Hollinger*, 560 P.2d at 825-26. A reasonable person in Decedent's circumstances would have known that the application required disclosure of an OSA diagnosis because of the

nature of the disorder and because of the application's explicit definition of the term

"other respiratory disorder." Therefore, Decedent made misrepresentations about his

health history knowingly and his misrepresentations were not the product of an

ambiguous application question.

    *c.*  *The facts Decedent concealed materially affected Defendant's*
        *acceptance of risk*

    An insurer may avoid coverage only if "the false statement of fact or the

concealed fact materially affected either the acceptance of the risk or the hazard

assumed by the insurer." *Id.* An insurer does not need to show that it would not have

issued the policy but for the misrepresentation. *West Coast Life*, 505 F. Supp. 2d at

750. Rather, the misrepresentation "must be [a]ctually material to the insurer's risk, as

demonstrated by customary underwriting procedures." *Wade v. Olinger Life Ins. Co.*,

560 P.2d 446, 452 (Colo. 1977).

    Here, Decedent's misrepresentations materially affected the risk Defendant

assumed. Based on Decedent's statement that he did not have any respiratory

disorders, Decedent was found to be eligible for Defendant's "Preferred Ultra" risk class,

"which is the best (i.e., least expensive) risk class that [Defendant] offers." (Doc. # 74 at

9.) However, under Defendant's underwriting guidelines, an applicant is not eligible for

the Preferred Ultra risk class if the applicant has been diagnosed with OSA that has not

been completely surgically resolved. (Doc. # 75 at 3.) Additionally, if an applicant's "pre-

CPAP sleep study shows that oxygen saturation levels dip below 90 percent at any

point, the applicant is not even eligible for the Preferred Plus risk class (the second best

class)." (Doc. ## 74 at 10, 75 at 2.) In both of Decedent's sleep studies, his oxygen saturation levels were below 90 percent for nearly an hour. (Doc. # 74-14 at 2, 12.)

If Decedent had disclosed his OSA diagnosis, Defendant "would have sought his medical records relating to the diagnosis, including the sleep study reports, and thereby would have discovered . . . Decedent's oxygen saturation levels . . . ." (Doc. # 74 at 11.) As a result, Decedent would have been "classified in the Preferred risk class." (*Id*.) With an accurate risk determination, Defendant would not have offered Decedent the coverage Decedent selected at the price Decedent paid. (*Id*.) Rather, Decedent's "annual premium would have purchased only $512,304.25 in coverage rather than $1 million." (*Id*.) Therefore, Defendant's underwriting procedures show that Decedent's misrepresentation materially affected Defendant's acceptance of risk because Decedent received coverage that was reserved for individuals who did not have Decedent's OSA related oxygen intake concerns.

> d.    *Defendant was unaware of the concealed facts and is not chargeable with knowledge of them*

The parties do not dispute that Defendant was unaware of Decedent's OSA diagnosis until after Decedent's death. Nevertheless, an insurer may have a duty to investigate representations that are made in its policy applications, which is to say that the insurer may be chargeable with knowledge of the concealed facts. *Silver*, 219 P.3d at 331. Such a duty arises only if the insurer has sufficient information to put a reasonably careful insurer on notice of a possible misrepresentation that "would have caused the insurer to begin an inquiry, which, if carried out with reasonable thoroughness, would have revealed the truth." *Id*.

Here, Defendant did not have a duty to investigate the representations Decedent made in his application. Decedent's responses to the inquiries in the application did not disclose his OSA diagnosis or any other medical conditions. (Doc. # 74 at 7-8.) Moreover, although Defendant hired a paramedical technician to conduct an examination of Decedent, the examination was intended to be a limited one. (*Id*. at 9.) Technicians who carried out such examinations were instructed to obtain "proof of applicant's identity . . .; applicant's vitals (including height, weight, blood pressure, and pulse); applicant's initials confirming height and weight; whether applicant had a moving violation, or had driver's license revoked, in previous five years; applicant's blood sample; and applicant's urine sample." (Doc. # 74-15 at 42.) None of the foregoing information revealed that Decedent suffered from OSA, and the examination did not put Defendant on notice that Decedent had made misrepresentations on his application. (Doc. # 74 at 9.) Therefore, Defendant was unaware of the facts concealed by Decedent's misrepresentations. Further, because Defendant did not have grounds to reasonably suspect that Decedent's application contained misrepresentations, Defendant's duty to investigate was not triggered and Defendant is not chargeable with knowledge of Decedent's omissions.

> e. *Defendant detrimentally relied on Decedent's misrepresentations*

An insurer may avoid coverage only if it "relied, to its detriment, on the false statement of fact or concealment of fact in issuing the policy." *Hollinger*, 560 P.2d at 827. Detrimental reliance occurs when one person's statement, conduct, or silence induces another to change position detrimentally in reasonable reliance on his words or

actions. *Cont'l W. Ins. Co. v. Jim's Hardwood Floor Co., Inc.*, 12 P.3d 824, 828 (Colo. App. 2000); *West Coast Life Ins. Co. v. Hoar*, 505 F. Supp. 2d 734, 754 (D. Colo. 2007) (quoting 6 LEE R. RUSS & THOMAS E SEGALLA, COUCH ON INSURANCE § 82:13 (3d ed. 1995) ("[The test is w]hether the fact or circumstance represented or misrepresented operated to induce the insurer to accept the risk, *or to accept it at a lower premium*.") (emphasis added)). Courts have held that if an insured's response to an application question induces an insurer to issue a policy at a premium that does not reflect the risk posed by the insured, it is appropriate to find—as a matter of law—that the insurer relied on the misrepresentation. *See West Coast Life*, 505 F. Supp. 2d at 755.

Here, Defendant clearly relied on Decedent's misrepresentations. Because Decedent did not disclose his OSA diagnosis, Defendant "agreed to underwrite [his] policy in the Preferred Ultra risk class, and it also did not seek any medical records that could have revealed that Decedent's oxygen saturation levels were below those required to qualify for the Preferred Plus risk class." (Doc. # 74 at 17.) As a result, Defendant agreed to issue twice as much coverage as Decedent was eligible for. (*Id.*) Therefore, Defendant relied on Decedent's misrepresentations because Decedent's assertion that he did not have a respiratory disorder induced Defendant to issue a policy that did not reflect the risk posed by Decedent.

In sum, Defendant has established that it detrimentally relied on material misrepresentations Decedent knowingly made on his insurance application. Thus, Defendant has met its initial burden of demonstrating the absence of a genuine dispute of material fact with respect to its right to avoid coverage on Decedent's life insurance

policy. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Plaintiff, by contrast, has failed to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). In particular, Plaintiff has failed to set forth facts rebutting Defendant's evidence on the *Hollinger* avoidance elements. Moreover, Plaintiff has failed to set forth facts showing that Decedent's misrepresentations were due to an ambiguous question on Defendant's insurance application. Therefore, there is no genuine dispute of fact and Defendant is entitled to summary judgment with respect to its right to avoid coverage on Decedent's life insurance policy.

      2.    <u>Whether Defendant Breached the Life Insurance Contract in Bad Faith</u>

Plaintiff alleges that Defendant breached the life insurance agreement into which Defendant entered with Decedent in bad faith. (Doc. # 12 at 4.) However, if an insured's misrepresentations have the consequence of voiding an insurance contract, the insured cannot maintain a bad faith breach of contract claim. *See West Coast Life*, 505 F. Supp. 2d at 753. It is "settled law in Colorado that a bad faith claim must fail if, as is the case here, coverage was properly denied . . . ." *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1193 (10th Cir. 2009). This Court has found that Decedent's knowing misrepresentations of material fact triggered Defendant's right to avoid the contract. *See supra* Section 1. Therefore, because Defendant's denial of coverage was proper as a matter of law, there is no genuine dispute of material fact as to whether Defendant breached its contract with Decedent in bad faith, and summary judgment is warranted.

3.      <u>Whether Plaintiff Satisfied its Burden of Production on its CCPA Claim</u>

The CCPA was enacted to regulate commercial activities and practices which, "because of their nature, may prove injurious, offensive, or dangerous to the public." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003) (quoting *People ex rel. Dunbar v. Gym of America, Inc.*, 493 P.2d 660, 667 (Colo. 1972)). Thus, the CCPA "deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Id.* (citations omitted). In order to prove a violation of the CCPA, a plaintiff must show:

(1) that the defendant engaged in an unfair or deceptive trade practice;

(2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;

(3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;

(4) that the plaintiff suffered injury to a legally protected interest; and

(5) that the challenged practice caused the plaintiff's injury

*Id.* at 146-47 (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)).

To establish a "deceptive trade practice," a plaintiff must show that a defendant "knowingly [made] a false representation." *Id.* at 147 (quoting Colo. Rev. Stat. § 6-1-105(1)(e)). A false representation, in turn, "must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers." *Id.* Misrepresentations are actionable when made "either with knowledge of [their] untruth, or recklessly and

willfully made without regard to [the] consequences, and with an intent to mislead and deceive the plaintiff." *Id*. (citation omitted). Importantly, a promise "cannot constitute a misrepresentation unless the promisor did not intend to honor it at the time it was made." *Id*. at 148 (citing *Brody v. Brock*, 897 P.2d 769, 776 (Colo. 1995); *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354,1362 (Colo. 1993)). Alternatively, a plaintiff may show that a false representation "had the capacity or tendency to deceive, even if it did not." Thus, as opposed to a breach of contract claim, "which arises when one contracting party breaks a promise, a CCPA claim arises when a party knowingly makes a misrepresentation or makes a false representation that has the capacity to deceive." *Id*.

Here, it is difficult to identify exactly what trade practices form the basis of Plaintiff's CCPA claim. Plaintiff's complaint alleges that Defendant:

- represented that Defendant's insurance and services are of a particular standard, quality, or grade, when Defendant knew or should know that they are of another;

- advertised its insurance and services with the intent to not provide such goods and services as advertised;

- engaged in deceptive, misleading, or after-the-fact underwriting practices; and

- failed to disclose material information concerning its goods and services, which information was known at the time of an advertisement or sale and such failure to disclose such information was intended to induce plaintiffs to enter into a transaction.

(Doc. # 12 at 5). As Defendant notes, "Plaintiff's complaint simply parrots back the language of the [CCPA], coupled with a bare assertion that [Defendant] engaged in the

enumerated 'prohibited and/or deceptive trade practices.'" (Doc. # 74 at 19.) Moreover, Plaintiff's response to the instant motion does not provide **any** facts regarding the challenged practices. *See* (Doc. # 82).

Plaintiff argues that "[t]he current argument related to the CCPA claim is nothing more than rehashing of [Defendant's] prior arguments and adds no new relevant facts or discussion." (*Id*. at 14.) Additionally, Plaintiff argues that Defendant's "argument is so lacking in substance as to deny Plaintiff a fair opportunity to respond to the same." (*Id*.) Defendant assumes, as will the Court, that Plaintiff's "theory for the CCPA claim is that [Defendant] intentionally uses vague questions in [its] Application in order to later deny life insurance claims based on the applicants' incomplete answers to those questions." (Doc. # 74 at 19.) Assuming *arguendo* that Defendant's trade practices are deceptive for purposes of the CCPA, Defendant contends that there is no genuine dispute of material fact with regard to Plaintiff's CCPA claim because Plaintiff has failed to submit evidence showing either that Defendant's challenged practices significantly impact the public or that the challenged practices caused Plaintiff's injury. The Court will address each argument in turn.

> a. *Public impact*

In order for a plaintiff to prove that a challenged trade practice has a significant impact on the public as actual or potential consumers of the defendant's goods, services, or property, the plaintiff must establish that the wrong is not private in nature. *Rhino*, 62 P.3d at 149. When analyzing whether a trade practice has a significant public impact, courts consider "(1) the number of consumers directly affected by the

challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Id*. Where a challenged trade practice affects only a small fraction of an entity's consumers, the impact on the public is not "significant" for purposes of the CCPA. *Id*. at 150 (concluding practice affecting 3 out of 500 consumers to be insufficiently significant); *Coors v. Sec. Life of Denver Ins. Co.*, 91 P.3d 393, 399 (Colo. App. 2003) (concluding "an impact on at most one percent of the policyholders could not constitute public impact" as a matter of law), *rev'd on other grounds*, 112 P.3d 59 (Colo. 2005). Rather, evidence that a challenged trade practice has a de minimis impact on an entity's consumers indicates that the dispute is private in nature and thus outside the scope of the CCPA. *See Rhino*, 62 P.3d at 150.

Here, Plaintiff's claim is private in nature. Between 2012 and 2017, Defendant processed more than 17,500 life insurance claims nationwide. (Doc. # 74 at 20.) Of those claims, Defendant denied a total of 109 contestable claims, "only two of which were from Colorado, including Plaintiff's claim . . . ." (*Id*.) Thus, Defendant denied "six-tenths of 1 percent" of the claims it processed. (*Id*.) As such, the trade practices Plaintiff challenges clearly have a de minimis impact on the public and are therefore outside the scope of the CCPA as a matter of law.

b.     *Causation*

Under the CCPA, a private plaintiff must prove that the challenged practice caused the plaintiff's injury. *Rhino*, 62 P.3d at 147; Colo. Rev. Stat. § 6-1-113. To prove

causation, a plaintiff must demonstrate a "causal link" between the "deceptive trade practices and the injury." *Hall v. Walter*, 969 P.2d 224. If a plaintiff cannot show a causal link between a defendant's deceptive trade practices and the plaintiff's injury, the plaintiff cannot recover damages under the CCPA. *Witters v. Daniels Motors, Inc.*, 524 P.2d 632, 634 (Colo. App. 1974).

Here, Plaintiff has failed to establish a causal link between Defendant's challenged practices and Plaintiff's alleged injury. In Plaintiff's complaint, Plaintiff alleges "as a direct and proximate cause of Defendant's deceptive trade practices, Plaintiff has been harmed in an amount to be proven at trial." (Doc. # 12 at 5.) However, Plaintiff has neither identified nor produced any allegedly deceptive advertisements or other information that Defendant has issued. (Doc. # 74-14 at 43.) Further, Plaintiff does not allege that Decedent saw or relied upon any deceptive information before he completed his life insurance application. As a result, Plaintiff has failed to demonstrate any causal connection between Defendant's allegedly deceptive trade practices and Plaintiff's alleged damages.

Additionally, Plaintiff alleges that Decedent "allowed a policy of life insurance benefitting Plaintiff in the amount of $400,000.00 to lapse because of and/or in anticipation of the issuance of the USAA life insurance policy." However, Decedent allowed his prior life insurance policy to lapse in June 2015 (Doc. # 74-15 at 45), yet he did not submit an application to Defendant until August 2015 (Doc. # 74-13 at 31). Therefore, because Decedent had not even submitted an application to Defendant when his prior life insurance lapsed, Defendant could not have relied upon his policy

with Defendant at the time his prior policy lapsed. Moreover, Plaintiff has not alleged that Decedent's decision to allow his former policy to lapse was influenced by any advertisement or information issued by Defendant. Thus, Plaintiff is not entitled to damages under the CCPA because Plaintiff has not presented evidence of a causal link between Defendant's allegedly deceptive trade practices and Plaintiff's alleged injury.

In sum, Plaintiff has failed to satisfy the burden of production on Plaintiff's CCPA claim. Plaintiff argues that Defendant is not entitled to summary judgment because Defendant "does not present affirmatively any evidence showing the [CCPA] claim lacks merit." (Doc. # 82 at 16.) However, in order to meet its burden as a movant for summary judgment who does not bear the ultimate burden of persuasion at trial for the CCPA claim, Defendant does not need to disprove Plaintiff's claim; rather, Defendant need simply point the Court to a lack of evidence for Plaintiff on an essential element of Plaintiff's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Defendant met its burden by pointing the Court to a lack of evidence on two essential elements of Plaintiff's CCPA claim. Specifically, Defendant noted that Plaintiff has not presented evidence that Defendant's challenged trade practices have a significant public impact. Further, Defendant established that Plaintiff has not presented evidence of a causal link between Defendant's allegedly deceptive trade practices and Plaintiff's injury.

Once Defendant met its initial burden, the burden shifted to Plaintiff to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Plaintiff asserts that Defendant's argument is "nothing

more than a rehashing of Defendant's prior motion [to dismiss] regarding the CCPA claim that has already been overruled by the Court." (Doc. # 82 at 16.) Therefore, Plaintiff effectively argues that the allegations in its complaint are sufficient for it to survive the instant motion for summary judgment. However, a nonmovant may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmoving party." *Adler*, 144 F.3d at 671. Here, Plaintiff failed to meet its burden because it did not offer any specific facts to substantiate the elements of its CCPA claim that Defendant challenged for lack of evidence. Therefore, Defendant is entitled to summary judgment.

### III.    CONCLUSION

Accordingly, the Court ORDERS that Defendant USAA Life Insurance Company's Motion for Summary Judgment is GRANTED.

DATED: October 26, 2018                BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge